# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KARLA Y. FOX,                          :
      Plaintiff               :        CIVIL ACTION NO. 3:14-CV-2061
                       :        (Judge Nealon)
      v.                      :
                       :
CAROLYN W. COLVIN,[1] Acting          :
Commissioner of Social Security        :
      Defendant               :

## MEMORANDUM

On October 24, 2014, Plaintiff, Karla Y. Fox, filed this instant appeal[2] under

42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social

Security Administration ("SSA") denying her application for disability insurance

benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 1461, et

seq. (Doc. 1). The parties have fully briefed the appeal. (Docs. 1, 9, 10, 11, 12,

13). For the reasons set forth below, the decision of the Commissioner denying

Plaintiff's application for DIB will be vacated and the matter will be remanded to

the Commissioner of SSA for further proceedings.

---

1.  Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration ("SSA") on February 14, 2013.

2.  Under the Local Rules of Court, "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

## BACKGROUND

On March 23, 2011, Plaintiff protectively filed[3] an application for DIB alleging disability beginning on July 19, 2010.  (Tr. 177-183, 195).[4]  The claim was initially denied by the Bureau of Disability Determination ("BDD")[5] on June 16, 2011.  (Tr. 99-116).  On August 22, 2011, Plaintiff filed a written request for a hearing before an administrative law judge.  (Tr. 122-123).  A hearing was held on November 28, 2012, before administrative law judge Sharon Zanotto ("ALJ"), at which Plaintiff, an impartial vocational expert, Andrew Caporale ("VE"), and a licensed psychologist and relative of Plaintiff, Gary Williams, testified.  (Tr. 19, 35-98).  On February 14, 2013, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff has not been under a disability, as defined in the Social Security Act, from July 19, 2010, through the date of the ALJ's decision.  (Tr. 16-34).

On March 5, 2013, Plaintiff submitted a request to the Appeals Council to

---

3.  Protective filing is a term for the first time an individual contacts the SSA to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4.  References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on December 23, 2014.  (Doc. 9).

5.  The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the SSA.

review the hearing decision.  (Tr. 14-15).  On August 22, 2014, the Appeals

Council denied the request for review of the ALJ's decision.  (Tr. 1-15).  Thus, the

ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on October 24, 2014.  (Doc. 1).  On

December 23, 2014, Defendant filed an answer and transcript from the SSA

proceedings.  (Docs. 9, 10).  Plaintiff filed a brief in support of her complaint on

February 6, 2015.  (Doc. 11).  On March 12, 2015, Defendant filed a brief in

opposition.  (Doc. 12).  On March 26, 2015, Plaintiff filed a reply brief.  (Doc. 13).

The matter is ripe for review.

Plaintiff was born on March 22, 1959.  (Tr. 177).  At all times relevant to

this matter, Plaintiff was fifty years old or older, making her a person closely

approaching advanced age.[6]  Plaintiff has a high school degree, as well as degrees

in radiology and nursing assistance, and can communicate in English.  (Tr. 77-79,

81-82, 198, 200).  Her employment records indicate she has worked as a server at

a concession stand, warehouse packer, bakery line assembler, bank auditor, florist

design and delivery person, mail sorter helper, and, most recently, home health aid

for an elderly woman.  (Tr. 60-61, 73-76, 86-89, 200, 206-222).  The records of

---

6.  "Person closely approaching advanced age.  If you are closely approaching advanced age
(age 50-54), we will consider that your age along with a severe impairment(s) and limited work
experience may seriously affect your ability to adjust to other work."  20 C.F.R. § 404.1563(d).

the SSA reveal that Plaintiff had earnings in the years from 1975 to 2012.  (Tr. 187-88).  Her annual earnings range from a low of $0.00 in 1983, 2011, and 2012, to a high of $31,313.85 in 1993.  (Tr. 188).  Her total earnings from 1975 to 2012 were $357,615.72.  (Tr. 188).

## MEDICAL RECORDS

On December 2, 1993, Plaintiff was brought to the Washington County Hospital emergency room by ambulance "with the history that she was the belted driver of an automobile which had crashed into a telephone pole." (Tr. 432).  She was found to be "alert enough to jabber incoherently" and, at times, said sentences that were intelligible, and the "context [was] non-sensible or not appropriate." (Tr. 432).  Plaintiff could not follow commands.  (Tr. 432).  Plaintiff had a "transverse laceration of the supraorbital area, bilaterally, which [was] bleeding." (Tr. 432).  While no blood was found behind the "tympanic membrane on the left side," blood was found "behind the tympanic membrane on the right side." (Tr. 432).  It was noted that "[t]o nonpainful stimuli the patient turn[ed] her head from side to side and ha[d] good purposeful movements of both upper and lower extremities." (Tr. 432).  Plaintiff's facial movement was "difficult to assess because of marked facial edema, bilaterally." (Tr. 432).

Upon her admission at Washington County Hospital, Plaintiff underwent a

4

CT scan, which revealed that she had a "fracture through the base of the skull on the right side, running into the right petreous pyramid in a transverse manner." (Tr. 432). Plaintiff also was found to have "fractures of multiple facial bones and a large calvarium fracture of the right frontotemporal area with a small epidural hematoma immediately below it." (Tr. 432). It was noted that in her "right frontotemporal area, there [was] a small chip of bone that [had] been depressed inwardly at about 5 mm." (Tr. 432). "There [were] multiple intraparenchymal contusions of the bifrontal areas and there [was] a fairly large intraparenchymal hematoma in the right frontotemporal region, just lateral to the frontal horn." (Tr. 432). She also had a "small intraparenchymal hematoma at the same position on the left side." (Tr. 432). A "slight shift of the midline structures to the right" was noted. (Tr. 432). Plaintiff's "[v]entricular system [was] small, [which indicated] the presence of diffuse cerebral edema." (Tr. 432). Neither Plaintiff's "lateral cervical spine" nor her "lateral lumbar spine" "showed no acute fracture or subluxation." (Tr. 432). A chest X-ray "showed no active lung disease." (Tr. 432). "X-rays of [Plaintiff's] pelvis showed a fracture involving the superior and inferior ramus of the right pubis," and "[t]here was a fracture of the inferior portion of the pubis on the left." (Tr. 432). Further, "[t]here was widening of the SI joint on the left and somewhat V-shaped fracture appearing to involve the

5

sacral ala on the left." (Tr. 432). Pelvic hematoma was also observed. (Tr. 432).

Plaintiff also underwent an EKG upon her admission to Washington County

Hospital, which "showed some ST segment changes in the inferior leads

suggesting the possible presence of ischemia, thought to be rate related." (Tr.

433). A "left atrial abnormality" "was also possible." (Tr. 433).

Plaintiff under went a repeat CT scan "in the afternoon" of December 2,

1993. (Tr. 433). That CT scan "showed no change from the scan performed at the

time of admission." (Tr. 433). It was also noted that "[c]linically she was also

unchanged." (Tr. 433).

By "December 6, [1993,] she was more awake and responded to questions."

(Tr. 433). Plaintiff was able to move all four (4) extremities well. (Tr. 433).

However, Plaintiff became "drowsy and mumbled only a few words" later that

day. (Tr. 433). Plaintiff underwent another cranial CT scan, which "showed

increased shift of midline secondary to mass effect of right frontal hematoma."

(Tr. 433). It was recommended that Plaintiff undergo a "[s]urgical evacuation of

the hematoma." (Tr. 433). Plaintiff then was taken to the operating room "where

she had a right frontotemporal bone flap performed and intracerebral hematoma

evacuated." (Tr. 433). Plaintiff "tolerated the surgery well and left the operating

room in serious condition." (Tr. 433).

6

On December 7, 1993, Plaintiff underwent a postoperative CAT scan, which "showed good reduction of the hematoma volume but no reduction of mass effect of edema." (Tr. 433). It was noted that her "clinical examination was unchanged from the preoperative examination." (Tr. 433).

On December 8, 1993, Plaintiff "developed a temperature elevation of 101." (Tr. 433). "A lumbar puncture was performed and specimens were sent to the laboratory for culture and sensitivity." (Tr. 433). Plaintiff had an "MRA performed to rule out ruptured aneurysm as the cause of her accident and intracerebral hematoma." (Tr. 433). "The MRA showed no evidence of aneurysm." (Tr. 433). Urine cultures and CSF culture showed no growth. (Tr. 433).

By December 9, 1993, Plaintiff was "afebrile" and "talking more readily." (Tr. 433). Plaintiff could "move both sides of her mouth." (Tr. 433). Plaintiff also had an X-ray done on her left knee, which showed no fractures. (Tr. 433). Her eyes were also evaluated, and her "globes were found to be intact." (Tr. 433). Plaintiff's corneas "were clear," and her "[i]ntraocular tensions were normal and there was no subconjunctival hemorrhages." (Tr. 433).

On December 10, 1993, Plaintiff was "very alert and opened both eyes and was oriented." (Tr. 433). She took "po fluids" and "had very good neurologic

improvement."  (Tr. 433).

On December 14, 1993, Plaintiff underwent a frontal craniotomy and cannulization of the frontal sinuses.   (Tr. 433).  Plaintiff was noted has having a "maxillomandibular fixation and application of arch bars performed."  (Tr. 433). Plaintiff also had "open reduction, internal fixation of the left zygoma, bone grafting of the left orbital floor, lacrimal duct probing, reduction of nasal fracture and repair of left frontozygomatic suture performed."  (Tr. 433).

On December 15, 1993, Plaintiff was "alert and oriented and moved all extremities well."  (Tr. 433).  She was "afebrile" and "had lost a lot of facial edema."  (Tr. 433-434).  Also, Plaintiff was found to be "neurologically stable." (Tr. 434).

On December 19, 1993, she "ambulat[ed] in PT with assistance but she complained of pelvic pain."  (Tr. 434).  Plaintiff experienced a "gradual lessening of the facial edema."  (Tr. 434).  On December 20, 1993, she was evaluated for amenorrhea, which was thought to be "post-traumatic in nature."  (Tr. 434).  By December 24, 1993, Plaintiff "walk[ed] with the use of a walker."  (Tr. 434). Plaintiff complained of diplopia "when the right eye was closed."  (Tr. 434). Additionally, Plaintiff was reevaluated but no abnormalities were found.  (Tr. 434).

On December 27, 1993, Plaintiff was transferred to a rehabilitation hospital. (Tr. 434). Her final diagnosis was the following: 1) open lacerations, forehead, lips, nose and nasolabial region; 2) multiple facial and cranial fractures involving the frontal sinus; 3) intracerebral hematoma, right frontotemporal area; and 4) pelvic fracture. (Tr. 434). Upon discharge, Plaintiff's condition was improved. (Tr. 434).

On January 24, 1994, Plaintiff was seen in ambulatory services at Washington County Hospital. (Tr. 506). Plaintiff reported "persistent but improving pain." (Tr. 506). Her visual acuity "improved to 20/30 vision with diplopia only in the inferior shield." (Tr. 506). She had "good asymmetry with minimal enophthalmus of the left eye." (Tr. 506).

On June 14, 1994, Plaintiff under went an Electroencephalography ("EEG") evaluation. (Tr. 507). Plaintiff's "resting background posteriorly and centrally [was] a low voltage mixture of 9 hertz alpha activity and small amounts of 20-24 hertz beta fast activity seen well bilaterally without asymmetry." (Tr. 507). It was also noted that "[a]nteriorly in the right hemisphere, there [was] underlying long wave length slow activity at 2-3 hertz throughout nearly all of the recording." (Tr. 507). "No major paroxysmal discharges of any sort [were] noted in this region." (Tr. 507). Further, "[n]o voltage asymmetries [were] seen," and "[n]atural sleep

was obtained with the usual forms seen well bilaterally without asymmetry." (Tr. 507). The EEG was "[a]bnormal . . . due to the presence of long wave length slow activity in the right anterior quadrant." (Tr. 507). It was noted that "[t]his finding [was] apparently not noted on an earlier tracing in 1994." (Tr. 507).

From to March 21, 1994, to July 25, 1994, Plaintiff underwent physical therapy at Robinwood Orthopaedic Specialty Center. (Tr. 508-514, 551-554, 556-565). On March 24, 1994, Plaintiff underwent a Work Hardening Initial Evaluation at the Rehab Center at Robinwood. (Tr. 559-561). From March 24, 1994, to April 14, 1994, Plaintiff participated in the Work Rehabilitation Program at the Rehab Center at Robinwood. (Tr. 549-550, 552-553, 556-557, 559-561). On March 31, 1994, and April 4, 1994, Plaintiff was evaluated by the Department of Occupational Therapy at the Washington County Hospital Association. (Tr. 555). From August 26, 1994, to December 22, 1994, Plaintiff underwent speech/language pathology therapy at the Rehab Center at Robinwood. (Tr. 523-547). Plaintiff also underwent occupational therapy at the Rehab Center at Robinwood from January 9, 1995, to February 7, 1995. (Tr. 515-516, 518-522).

On June 17, 2005, Plaintiff presented to the Chambersburg Hospital emergency room with a complaint of continued pain related to her right finger that she accidentally jammed at work the night before while packing a box of packing

material.  (Tr. 269).  Plaintiff had no other complaints, and was diagnosed with a finger sprain.  (Tr. 269).  Plaintiff was discharged home in stable condition.  (Tr. 269).

On September 15, 2005, Plaintiff presented to the Chambersburg Hospital's emergency room with a chief complaint that she injured her head due to her hitting it on the top of the right side.  (Tr. 271).  The emergency room report noted that Plaintiff did not experience loss of consciousness, but did have a headache for a "bit."  (Tr. 271).  Hours later Plaintiff experienced some tingling below her left cheek and thought her eyes were swelling.  (Tr. 271).  Plaintiff did not have visual complaints, earache, sore throat, neck or back pain, trouble breathing, or weakness or numbness in her arms or legs.  (Tr. 271).  The report also noted that Plaintiff had a head injury in the past with "multiple plates and screws in her head, history of tonsillectomy, cholecystectomy, and fractured pelvis post MVA remotely."  (Tr. 271).  A CT scan of Plaintiff's head was ordered.  (Tr. 271).

A CT scan of Plaintiff's head was conducted on September 15, 2005.  (Tr. 273).  The scan revealed that Plaintiff has encephalomalacic as to both frontal lobes, which was "apparently secondary to old trauma."  (Tr. 273).  Encephalomalacic changes were "seen in the frontal areas bilaterally, right greater than left."  (Tr. 273).  Phillip J. Sabri, M.D., found "[n]o acute process."  (Tr. 274).

11

Evidence of previous right frontal craniotomy and surgical repair of maxillofacial injury was found. (Tr. 274). No bleeding was found during the scan. (Tr. 274). Dilation of the frontal horn of the right lateral ventricle was found. (Tr. 274). The report also noted that there was some swelling above Plaintiff's left eyebrow and Gerald E. Wilwerth, M.D., the examining doctor, "questioned whether the bump on the head could have allowed some of the swelling to transverse down to her left eyebrow." (Tr. 273). The report also stated that Plaintiff had no visual complaints, headaches, neck pain, or paresthesis. (Tr. 273). Dr. Wilwerth also reported that Plaintiff was able to walk and ambulate without difficulty. (Tr. 273). Plaintiff was ordered to follow up at "Occupational Health" the next day and not to work until cleared. (Tr. 273).

On February 6, 2008, Plaintiff presented to the Keystone Rural Health Center with a chief complaint of "some recurring dizzy spells." (Tr. 307). Plaintiff was examined by Dr. Michael Patti. (Tr. 307). Plaintiff described her "dizzy spells" as "vertiginous episodes" the started three (3) weeks prior to her evaluation. (Tr. 307). Plaintiff reported that her first spell occurred while she was shopping. (Tr. 307). According to Plaintiff, she was looking up at clothes on a rack, but when she looked down she felt "a few seconds of dizziness." (Tr. 307). A couple days prior to her examination, Plaintiff experienced another spell while

she was driving.  (Tr. 307).  Plaintiff stated that she was moving her head and "had an episode where things went black and were spinning."  (Tr. 307).  Plaintiff was able to pull the automobile over and avoid an accident.  (Tr. 307).  Plaintiff reported that during the three (3) weeks prior to her examination she had "several other episodes."  (Tr. 307).

In regards to Plaintiff's past medical history, Dr. Patti noted that Plaintiff had "not had any medical care for the last 10 years."  (Tr. 307).  He did note that Plaintiff was in "a significant MVA 1993 with significant head trauma, multiple surgeries to repair fractures of the head and face."  (Tr. 307).  Also that Plaintiff has a "pretty bad cold" a month prior to her examination and has a history of sinus problems in the past.  (Tr. 307).  Dr. Patti noted that "[b]esides the car accident in 1993, past surgical history includes tonsillectomy, cholecystectomy, femur fracture which has led to leg length discrepancy which causes some chronic hip and back pain."  (Tr. 307).  Plaintiff also reported that she was taking Advil and "some occasional Celebrex that she gets from her mother."  (Tr. 307).

During her exam with Dr. Patti, Plaintiff underwent a neurological exam, which included "Hall-Pike maneuvers which demonstrate[d] positive brief episodes of vertigo without any latency that occur[red] when she [laid] with her head extended to either the left or the right and she sits up."  (Tr. 307).  Dr. Patti

13

also noted that he could produce the same thing as she sat upright when Dr. Patti

had "her look up for approx 30 sec and then look[] straight ahead." (Tr. 307). Dr.

Patti concluded that "[t]his appear[ed] to be consistent with vertebrobasilar

insufficiency." (Tr. 307). Dr. Patti noted that he wanted " to get an MRA of the

cerebral circulation to include the vertebrobasilar system to see if there [was] any

evidence of impaired circulation." (Tr. 307). Dr. Patti also ordered Plaintiff to not

drive and to follow up if she developed any new symptoms, or if her symptoms

increased. (Tr. 307).

On February 15, 2008, Plaintiff under went "MR angiogram of the head."

(Tr. 283). Henry T. Ching, M.D., prepared a report based on the results of the

diagnostic imaging. (Tr. 283). Dr. Ching noted that the exam was "somewhat

limited by motion artifact." (Tr. 283). Dr. Ching found the following: anterior

circulation was unremarkable in appearance; basilar artery was widely patent;

right vertabral artery appeared larger than left; and some prominence of the basilar

artery near the origin of the left superior cerebellar artery and near the origin of the

left posterior cerebral artery. (Tr. 283). Dr. Ching stated that he could not "rule

out some extasia or aneurysmal dilation in" Plaintiff's left side of the basilar artery

near the origins of the left posterior cerebral artery and left superior cerebellar

artery. (Tr. 283). "However," Dr. Ching noted, "this [was] not optimally seen

14

because of motion artifact. CT angiogram of the head [was] recommended for further evaluation."  (Tr. 283).  The report also noted that "some atrophy involving the left and right frontal lobes, right side greater than left," which "could [have been] be due to old trauma or perhaps surgery."  (Tr. 283).  Dr. Ching stated that "[i]f this ha[d] not been imaged before, [he] would recommend correlation with head CT or MRI of the brain."  (Tr. 283).  A "metal artifact in the region of the right frontal skull" was also observed Dr. Ching "which could be due to previous craniotomy."  (Tr. 283).

On February 21, 2008, Plaintiff presented to the Keystone Rural Health Center to go over her MRA results with Dr. Patti.  (Tr. 305).  The MRA results "demonstrated possible ectasia aneurysm at the origin of the left-posterior cerebral artery, left superior cerebellar artery."  (Tr. 305).  A recommendation that Plaintiff undergo a CT angiogram was noted.  (Tr. 305).  Dr. Patti also reported that the "other note that was made not he [(sic)] MRA was atrophy or encephalomalacia of the inferior portion of the frontal lobes, right greater than left, and recommended either a head CT or MRI of the brain."  (Tr. 305).  Dr. Patti stated that after discussing this with Plaintiff it seemed to "make the most sense to do a head CT with and without contrast to get the CT of the head and the CT angiogram at one time rather than an MRI and a CTA."  (Tr. 305).  During her visit with Dr. Patti

Plaintiff also complained of a rash that had been present for weeks and seemed to be getting "somewhat better."  (Tr. 305).  Plaintiff was instructed to use Eucerin cream and follow up after CT scans had been completed.  (Tr. 305).

On February 27, 2008, Plaintiff underwent a CT angiogram of the circle of Willis to "[c]heck for possible basilar artery aneurysm."  (Tr. 281).  Dr. Ching reviewed the diagnostic imaging and prepared a report, which was compared to Plaintiff's February 15, 2008 exam.  (Tr. 281-282).  Dr. Ching found a "slight prominence of the far superior tip of the basilar artery."  (Tr. 281).  "However," Dr. Ching noted that he believed "that this [was] related to a confluence of vessels in that area."  (Tr. 281).  Dr. Ching also found that "the prominence of the basilar tip to the left of midline appear[ed] to be secondary to the fact that there [was] duplication of the left superior cerebellar artery such that there [were] two vessels in that region."  (Tr. 281).  According to Dr. Ching, "[t]his therefore create[d] prominence of the basilar artery tip between the left superior cerebellar artery and the posterior cerebral artery."  (Tr. 281).  Dr. Ching did not "believe that this represent[ed] a pathologic aneurysm in that area."  (Tr. 282).

Dr. Ching also noted that the left and right internal carotid arteries, left and right cerebral arteries, anterior cerebral arteries and posterior cerebral arteries were unremarkable; and there was no arteriovenous malformation.  (Tr. 281).  Dr. Ching

did note that there was "redemonstration of encephalomalacia involving the inferior aspects of the left and right frontal lobes." (Tr. 281). Dr. Ching did not find hydrocephalus, midline shift, or hemorrhage. (Tr. 281). Dr. Ching did find dilation of the right frontal horn secondary to encephalomalacia in the right frontal lobe and a bifrontal craniotomy. (Tr. 281). Dr. Ching also found "some moderate mucosal thickening in the right ethmoid sinus and right sphenoid sinus." (Tr. 281). "[M]oderate mucosal thickening in the right maillary sinus" was also found. (Tr. 282). Dr. Ching also noted "post-traumatic change of the left maillary sinus." (Tr. 282). Additionally, Dr. Ching saw a "metallic plate along the anterior aspect of the left maillary sinus." (Tr. 282). Dr. Ching also identified "a defect along the roof of the right sphenoid sinus that measures close to 1 cm in transverse diameter." (Tr. 281). Dr. Ching stated that the "defect" measured "approximately 2.8 cm in AP length." (Tr. 281). Also, some downward herniation of the intracranial contents into the superior aspect of the right sphenoid sinus was observed. (Tr. 281). Dr. Ching also found a "defect along the roof of the right ethmoid sinus with some downward extension of intracranial contents into that region." (Tr. 281-282). According to Dr. Ching, "[t]he downward extension of intracranial contents into the right sphenoid sinus and right ethmoid sinus measures about 1 cm." (Tr. 282).

17

On March 3, 2008, Plaintiff called Keystone Rural Health Center requesting the results of her CT scan.  (Tr. 305).  She was advised of the results.  (Tr. 305).  Plaintiff also asked for treatment options as to her issues with vertigo.  (Tr. 305).  Plaintiff was instructed to make a follow up appointment, "but due to lack of insurance, request[ed] phone call."  (Tr. 304).

On March 7, 2008, Plaintiff had a follow up with Dr. Patti at Keystone Rural Health Center to review the results of her CT scan and receive treatment for a leg rash.  (Tr. 303).  Dr. Patti reported that the results of the scan were "both interpreted as essentially normal."  (Tr. 303).  According to Dr. Patti, Plaintiff was "status post significant head trauma following a MVA but the changes that [were] identified [were] consistent with trauma she has undergone, the need for craniotomy etc."  (Tr. 303).  Dr. Patti also noted that "[n]o evidence of any aneurysms [was] identified."  (Tr. 303).  "[A]t the end of the appointment [Plaintiff] also mentioned that she [was] still feeling somewhat lightheaded particularly during one of her clinical classes where she [gave] shots."  (Tr. 303).  Dr. Patti did note that Plaintiff had "an issue with needles."  (Tr. 303).  Dr. Patti also reported that the "H/A symptoms [Plaintiff] had at her last visit [had] resolved."  (Tr. 303).

On July 10, 2008, Plaintiff underwent a complete physical examination with

Dr. Patti at Keystone Rural Health Center, "primarily for an externship through Kaplan College in Hagerstown, patient is going to be working as an M.A." (Tr. 301). Plaintiff reported that she experienced problems with "chronic tinnitus following an automobile accident in 1993 when she developed a hemotympanum," swelling in her feet and ankles, excessive thirst, joint pain, and stiffness. (Tr. 301). Plaintiff's visual acuity was found to be 20/30 and 20/40 in her right and left eye, respectively. (Tr. 301). Dr. Patti found that her hearing in her left ear was "absent." (Tr. 301). Dr. Patti also noted that "[i]t sounds as though she ha[d] carpal tunnel syndrome." (Tr. 301).

Dr. Patti recommended that Plaintiff receive shots for tetanus, hepatitis B, and PPD, be evaluated by an optometrist, and have lab work done "in part due to her thirst and swelling, family history of diabetes to include BMP, CBC, liver function tests, lipids, and a TSH." (Tr. 301). Plaintiff also was instructed to undergo a mammogram. (Tr. 301).

On July 16, 2008, Plaintiff had a follow up with Dr. Patti to review her lab testing. (Tr. 299). "The pertinent positives include[d] a fasting sugar of 113, total cholesterol 251 to include a breakdown with triglycerides 320, LDL 150, HDL 37." (Tr. 299). Dr. Patti recommended that Plaintiff receive a dietary evaluation and increase her exercise and activity. (Tr. 299). Dr. Patti also recommended that

Plaintiff have her cholesterol and BMP retested "in approximately three months if she ha[d] altered her diet, started exercising, otherwise in 6-9 months she should have it repeated but [Dr. Patti] would like to see what results [he could] get with a dedication of exercise and diet prior to initiating any medication to manage these issues."  (Tr. 299).

On January 8, 2009, Plaintiff presented to Keystone Rural Health Center complaining of "pain in her face and maxillary sinus area which she's had for 5-7 days."  (Tr. 297).  According to Plaintiff, when she would wake up in the morning she would have a lot of "purulent drainage" out of her nose.  (Tr. 297).  Plaintiff reported that she continued to have "copious amounts of drainage from her nose and a sore throat."  (Tr. 297).  Plaintiff also complained of a low grade fever.  (Tr. 297).  Plaintiff was provided with "Cipro 500 BID for 10 days," and instructed to follow up if she did not improve within "48 to 72 hours."  (Tr. 297).

On October 20, 2009, Plaintiff presented to Keystone Rural Health Center with complaints of fever, maxillary sinus congestion, low grade fever, purulent nasal drainage, and some ear pressure.  (Tr. 295).  Plaintiff was ordered to take a "Z-pak" as directed and to follow up "if not improving."  (Tr. 295).

On October 27, 2010, Plaintiff underwent a consultive examination with

Edward J. Yelinek, Ph.D.[7]   (Tr. 320-327).  Dr. Yelinek observed Plaintiff walk

"very easily from the waiting room to the evaluation room."  (Tr. 320).  Plaintiff

did not exhibit any noticeable problems with her posture or gait.  (Tr. 320).  As to

Plaintiff's history of illness, she stated that she had "no get up and go. [She does

not] get along well with others."  (Tr. 320).  Plaintiff reported that she had

"difficultly with comprehension. . . . [and] that she [had] difficulty understanding

directions that a supervisors would give her on a job."  (Tr. 320).  According to

Plaintiff, she needed "people to explain specifically what need[ed] to get done."

(Tr. 320).  Plaintiff indicated to Dr. Yelinek "that her difficulties began following

an auto accident about 8 years ago."  (Tr. 321).  She reported that she did not

remember "anything."  (Tr. 321).  Plaintiff stated that the accident resulted in the

following: "a number of fractures," her "head was reconstructed;" she lost hearing

in her right ear, but did not suffer from tinnitus; she could not taste or smell; and

had a very poor memory.  (Tr. 321).

　　　　Plaintiff also indicated to Dr. Yelinek that she experienced "job problems"

after the auto accident.  (Tr. 321).  Plaintiff stated that she submitted job

applications, but did not receive any calls.  (Tr. 321).  Also, Plaintiff reported that

---

7.  Dr. Yelinek completed his report regarding this examination on June 7, 2011.  <u>See</u> (Tr. 330-337).

she would mix up the alphabet, had difficulty "adjusting to changes on a job," and did not handle stress well.  (Tr. 321).  At the time of her appointment with Dr. Yelinek, Plaintiff stated that she had been unemployed for about six (6) months, and that she did work in home healthcare, which ended when the "woman she was caring for died."  (Tr. 321).  Plaintiff reported that she did household chores, watched television, read, and did Soduku.  (Tr. 321).  Plaintiff also stated that she received child support, food stamps, and had a medical assistance card.  (Tr. 321).

As for her medical treatment, Plaintiff stated that she received primary medical care at Waynesboro Family Practice.  (Tr. 321).  Plaintiff was not consulting with a psychiatrist, nor was she seeing a therapist.  (Tr. 321).  Plaintiff did note that after her auto accident she consulted with two (2) therapists.  (Tr. 321).  Plaintiff stated that she has never been psychiatrically hospitalized. Plaintiff did report to Dr. Yelinek that she had issues with "dizziness."  (Tr. 321). According to Plaintiff, she was not taking any medication.  (Tr. 321).

During the examination, Dr. Yelinek evaluated Plaintiff's mental status. (Tr. 321-323).  Dr. Yelinek found that Plaintiff was awake and alert for the evaluation.  (Tr. 321).  She was "oriented to time, place, person, and situation." (Tr. 322).  Plaintiff appeared well groomed.  (Tr. 322).  No noticeable behavioral abnormalities or tics were observed.  (Tr. 322).  Plaintiff's "mood appear[ed]

22

mildly depressed." (Tr. 322). Plaintiff had a "constricted" affect and spoke in monotone "without making eye contact." (Tr. 322). Plaintiff reported that she slept poorly and had "early morning awakening." (Tr. 322). Plaintiff also stated that she had poor stamina and tired easily. (Tr. 322). She reported being socially withdrawn and having no friends. (Tr. 332). Dr. Yelinek found Plaintiff's "fund of information [to be] good." (Tr. 322). Plaintiff "was able to name 4 men who have been Presidents of the United States since 1950." (Tr. 322). Plaintiff performed simple arithmetic calculations. (Tr. 322). Her attention and concentration were good and "was able to perform serial 7s." (Tr. 322). Plaintiff's "concept formation" was good, and was found to be able to think abstractly. (Tr. 322). Dr. Yelinek noted that Plaintiff was "able to name the way that different objects are alike." (Tr. 322). Dr. Yelinek stated that he believed "she [was] functioning within the average range of intelligence although not formally tested." (Tr. 322). Plaintiff did state to Dr. Yelinek that she completed three Associate's degrees. (Tr. 322).

Dr. Yelinek also noted that Plaintiff's "perceptions remain[ed] intact," and "[t]here was no evidence" of "delusions or hallucinations." (Tr. 322). Plaintiff denied "current and past suicidal ideation or intent," "current and past homicidal ideation or intent," and stated that she had difficulty with impulse. (Tr. 322).

Plaintiff reported that she "can become easily angered." (Tr. 322). Dr. Yelinek also found that there was no evidence for "depersonalization," unusual fears, "obsessions or compulsions although [Plaintiff] [did indicate] that she does ruminate on her performance." (Tr. 323). Plaintiff's speech was "clear and understandable," and her thought process "appeared goal directed." (Tr. 323). According to Dr. Yelinek, Plaintiff's thoughts centered on problems she experienced after her automobile accident. (Tr. 323). Specifically, her memory and mood problems. (Tr. 323).

Dr. Yelinek noted that Plaintiff did "demonstrate difficulty with memory." (Tr. 323). According to Dr. Yelinek, Plaintiff "had much difficulty describing incidents from the past." (Tr. 323). Plaintiff's recollection "tended to be rather sketchy and impressionistic; her remote memory appear[ed] poor." (Tr. 323). Plaintiff was not able to remember "what she ate for her most recent meal;" and Dr. Yelinek noted that "her recent memory appear[ed] poor." (Tr. 323). Plaintiff's immediate memory was found to "very limited; she [could] recall 3 digits in the forward direction and 4 digits in the reverse direction." (Tr. 323). Dr. Yelinek also concluded that Plaintiff's "social judgment" appeared poor. (Tr. 323). Further, although Plaintiff indicated that she has never had "legal difficulties," she stated that she "jumped a supervisor because of a pay check."

(Tr. 323).  Dr. Yelinek also found that Plaintiff's test judgment appeared "good."

(Tr. 323).

Dr. Yelinek had the following diagnostic impressions: as to Axis I, Plaintiff

was diagnosed with depressive disorder; no diagnosis in Axis II; medical history

was cited in regards to Axis III; as to Axis IV, Plaintiff had medical, vocational,

and financial problems; and for Axis V, Plaintiff was found to have a GAF of 55.

(Tr. 323-324).  According to Dr. Yelinek, Plaintiff's prognosis was that she had

demonstrated difficulties with "memory on the mental status," and that "the

likelihood for any significant improvement in the near term is fairly poor."  (Tr.

324).  As to Plaintiff's capability, Dr. Yelinek found Plaintiff was able to perform

simple arithmetic calculations, her concentration and attention was good, and that

she, therefore, could manage funds awarded to her.  (Tr. 324).

As a result of his evaluation, Dr. Yelinek found that Plaintiff's ability to

understand, remember, and carry out instructions were affected by the impairment.

(Tr. 326).  Specifically, Dr. Yelinek found that Plaintiff had moderate restriction

as to her ability to understand, remember, and carry out short, simple instructions.

(Tr. 326).  Dr. Yelinek also concluded that Plaintiff had marked restriction as to

her ability to understand and remember detailed instructions, carry out detailed

instructions, and make judgments on simple, work-related decisions.  (Tr. 326).

25

Dr. Yelinek also found that Plaintiff's ability to respond appropriately to supervision, co-workers, and work pressures in a work setting were affected by the impairment.  (Tr. 326).  According to Dr. Yelinek, Plaintiff had moderate restrictions for the following work-related mental activities: interact appropriately with the public, interact appropriately with supervisors, interact appropriately with co-workers, respond appropriately to work pressures in a usual work setting, and respond appropriately to changes in a routine work setting.  (Tr. 326).

On May 11, 2011, Mohammad Haq, M.D., evaluated Plaintiff.  (Tr. 338-342).  Dr. Haq noted that Plaintiff was in an automobile accident in 1993.  (Tr. 338).  As a result of the accident, Plaintiff suffered a head injury, which required extensive surgery, lost hearing in her right ear, decreased vision on right side, and lost her sense of smell and taste.  (Tr. 338).  Dr. Haq also noted that subsequent to the accident Plaintiff "had a few problems of decreased mentation."  (Tr. 338).  Specifically, "[w]hen she [was] working, she los[t] track," "need[ed] constant reminders to stay focused," and became "overwhelmed very easily, especially if there [was] anything new."  (Tr. 338).  Dr. Haq also noted that Plaintiff felt "very apprehensive and unable to complete" learning new skills.  (Tr. 338).  Plaintiff could not take direction, and had to "ask the employer for clues and also repeated instruction to do the same thing because she tend[ed] to forget."  (Tr. 338).

Plaintiff claimed that everything had to be "explained to her fully and sometimes repeatedly to closely stay on focus." (Tr. 339). Plaintiff also could not "remember the sequence of the alphabet when she tried to file" folders in alphabetical order. (Tr. 338). According to Dr. Haq, Plaintiff also had trouble remembering names and phone numbers, but could remember her own phone number. (Tr. 338). Dr. Haq noted that, socially, Plaintiff could not understand "subtle messages or . . . interpret the meaning of the talk" during a conversation. (Tr. 339). Plaintiff also had "difficulty understanding jokes." (Tr. 339). Dr. Haq reported that Plaintiff was able to drive and denied getting lost. (Tr. 338). Further, Plaintiff stated that she did not drive out of town. (Tr. 339). Plaintiff indicated that she "tried working . . . [and] worked as a personal care aide for a disabled patient for four years but since July 2010 she has not been able to find a job or work." (Tr. 339).

As to her physical history, Dr. Haq noted that Plaintiff's knees gave out, but there was no history of pain or stiffness of the knee. (Tr. 339). According to Plaintiff, during her attempts to use a stairway her knee would give out and she felt as though she did not have control over her knee movement. (Tr. 339). Dr. Haq reported that Plaintiff did not complain of "any numbness or weakness of the knees." (Tr. 339). Plaintiff indicated to Dr. Haq that the "last time it happened was two years ago who she fell when coming down from the stairs." (Tr. 339).

27

Dr. Haq stated that "[o]n regular flat surface walking," Plaintiff did "not feel any knee giving out.  It happened only when she [went] up and down the steps, and she ha[d] to be very careful when she [went] up and she h[eld] the railing."  (Tr. 339).

Plaintiff reported to Dr. Haq that she also had a history of "stiffness and pain in her hip and also in the back and the hands."  (Tr. 339).  According to Plaintiff, her right-side was worse than her left.  (Tr. 339).  Dr. Haq noted that Plaintiff could "walk without any problems but she started having pain in her right hip when she [went] . . . shopping."  (Tr. 339).

As to her mental health, Plaintiff told  Dr. Haq that she had a "history of depression and [felt] sad most of the time."  (Tr. 339).  Plaintiff stated that she did not care "whether her house [was] clean or if she [was] clean, or if she [was] wearing the proper clothes or not."  (Tr. 339).  According to Plaintiff, she did "not feel like doing much and sometimes it [got] out of hand, that she [did] not take a shower, she [did not] care to change her clothes or cook for a few days."  (Tr. 339).  Further, Plaintiff indicated that "sometimes" she felt "down in the dumps." (Tr. 339).  Dr. Haq did note that Plaintiff denied being suicidal and that she felt her "life is worth living, especially in that she has to take care of her teenage daughter."  (Tr. 339).

During his examination of Plaintiff, Dr. Haq made the following notations

in regards to Plaintiff's systems: she denied any history of weight gain or weight loss, fatigue, fever, sleep disturbances, history of chest pain, pressure or palpitations, history of allergies or headaches, shortness of breath, cough or sputum production, nausea, vomiting, constipation or diarrhea, burning on urination, and stress incontinence. (Tr. 339-340). Dr. Haq also found Plaintiff to be conscious, alert, active, oriented, and sat comfortably. (Tr. 340). Her "blood pressure [was] 110/70, pulse [was] 98, weight [was] 198, and oxygen saturation [was] 97%." (Tr. 341). Dr. Haq also found Plaintiff's head to be normal, her "[r]ight eye palpebral fissure [was] slightly bigger on the right compared to the left side." (Tr. 341). Plaintiff's pupils were "normal and reactive to light. EOM [was] normal." (Tr. 341). Dr. Haq did not report any issues with Plaintiff's neck, lungs, heart, abdomen, or extremities. (Tr. 341). As to Plaintiff's musculoskeletal exam, Dr. Haq found no muscular atrophy, tenderness of hands or knee, but found tenderness in right hip "at greater trochanteric area." (Tr. 341). Dr. Haq noted that Plaintiff's range of motion was normal in her neck, back, hip, and knee. (Tr. 341).

Dr. Haq also examined Plaintiff's neurologic status. (Tr. 341). Dr. Haq found that Plaintiff was able to hear the normal level of conversation, her field of vision on her right side was slightly decreased, her "[f]undi bilaterally [were]

normal," her visual acuity on her right side with glasses was 20/30, while her left side was 20/20.  (Tr. 341).  Dr. Haq also found Plaintiff's "[c]ranial nerves" to be intact, but also noted that Plaintiff could not "smell or taste, and there [was] a loss of hearing on the right side."  (Tr. 341).  Dr. Haq did not find a motor deficit.  (Tr. 341).  Dr. Haq reported that Plaintiff's "[d]eep tendon reflexes [were] present in upper extremities but diminished bilaterally in both knees."  (Tr. 341).  Also, Plaintiff was found to have no sensory loss.  (Tr. 341).

Based upon his exam, Dr. Haq concluded that Plaintiff suffered from the following: 1) "[s]tatus post head injury in '93 rise to mild cognitive impairment;" 2) depression; 3) arthritis and musculoskeletal pain in her right hip; 4) loss of hearing in her right ear; and 5) loss of taste and smell.  (Tr. 342).  Dr. Haq also noted that "[t]he [Plaintiff was] oriented, and [she knew] the date and time, but [her] short term memory appear[ed] to be impaired."  (Tr. 342).  Dr. Haq noted that Plaintiff "could not remember any of the words which she was asked to remember."  (Tr. 342).

Dr. Haq also completed a "Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities."  (Tr. 343).  Dr. Haq found that

30

Plaintiff had no limitation as to lifting, carrying, standing, walking, or sitting.[8] (Tr. 343).  Dr. Haq noted that Plaintiff could frequently bend, kneel, stoop, crouch, balance, and climb.  (Tr. 343).  Dr. Haq stated that Plaintiff's sight, hearing, taste, and smell were affected by her impairments.  (Tr. 344).  Dr. Haq also found that Plaintiff's "reaching," "handling," "fingering," "feeling," "speaking," and "continence"[9] were not affected by her limitations.  (Tr. 344).

On June 23, 2011, Plaintiff presented to Waynesboro Family Medical Associates for pain in her right hip and right index finger.  (Tr. 387).  She reported that this pain had been present for about six (6) months and was increasing.  (Tr. 387).

On that same day, Plaintiff was admitted to Waynesboro Hospital for the pain in her right hip and right index finger.  (Tr. 357, 387).  At Waynesboro Hospital, Plaintiff underwent diagnostic imaging on her right hip and right hand.  (Tr. 357, 365).  Dr. Peter J. Fang found an "[o]ld fracture involving the medial aspect of the right superior and inferior public ramus . . . . [and] an old healed fracture involving the left inferior pubic ramus" (Tr. 357).  Dr. Fang also noted

---

8.  While Dr. Haq checked no limitation as to sitting, he also noted that Plaintiff should sit for four (4) hours at a time.  (Tr. 343).  Dr. Haq did not make a determination as to whether Plaintiff had any limitations for pushing and pulling or environmental restrictions.  (Tr. 343-344).

9.  Dr. Haq found  that Plaintiff did not have "stream incontinence."  (Tr. 344).

that Plaintiff's "bilateral hips appear[ed] unremarkable." (Tr. 357). Dr. Fang also

stated that he observed "[d]egenerative change." (Tr. 357). Specifically, Dr. Fang

noted a degenerative change "with narrowing of the medial inferior aspect of the

right hip joint." (Tr. 357). Dr. Fang also found a "mild degenerative change of

the S-I-joints bilaterally . . . . [and a] degenerative change of the visualized lower

lumbar spine." (Tr. 357). Additionally, Dr. Fang did not find an "apparent

fracture, dislocation and/or bony destructive change." (Tr. 357). Dr. Fang also

observed "[c]alcification in the pelvis from old phleboliths." (Tr. 357).

As to her right hand, Dr. Fang found that Plaintiff had a "[m]ild

degenerative change of the DIP joints" and "about the first metacarpal-carpal joint

space." (Tr. 365). Dr. Fang did not find evidence of a fracture or dislocation, nor

did he find a "bony destructive change." (Tr. 365).

On June 30, 2011, John Gavazzi, Psy. D., assessed Plaintiff as part of her

disability determination. (Tr. 103-110). Dr. Gavazzi found that Plaintiff's

"[c]erebral trauma," "[a]ffective disorders," and "Organic Brain Syndrome" to be

"severe." (Tr. 103). As to Plaintiff's affective disorders and organic mental

disorders, Dr. Gavazzi found medically determinable impairment is present for

each category, respectively, that "does not precisely satisfy the diagnostic criteria

above." (Tr. 104). In regards to her affective disorder, Dr. Gavazzi noted that it

32

resulted in a mild restriction of activities of daily living, moderate difficulties in

maintaining social functioning, and moderate difficulties in maintaining

concentration, persistence, or pace.  (Tr. 104).  Dr. Gavazzi also concluded that

"[e]vidence [did] not establish the presence of the 'C' criteria."  (Tr. 104).

As part of his assessment, Dr. Gavazzi made a determination regarding

Plaintiff's mental residual functional capacity ("RFC").  (Tr. 105-107).  Dr.

Gavazzi opined that Plaintiff had an understanding and memory limitation.  (Tr.

105).  According to Dr. Gavazzi, Plaintiff's ability to remember locations and

work-like procedures, as well as her ability to understand and remember very short

and simple instructions, was not significantly limited.  (Tr. 105).  However, Dr.

Gavazzi did find that Plaintiff was "[m]oderately limited" in her ability to

understand and remember detailed instructions.  (Tr. 106).  Dr. Gavazzi went on to

state that Plaintiff could "understand, retain, and follow simple job instructions,

i.e., perform one-and two-step tasks" and "perform simple, routine, repetitive work

in a stable environment."  (Tr. 106).  Dr. Gavazzi also found that Plaintiff had

sustained concentration and persistence limitations.  (Tr. 106).  According to Dr.

Gavazzi, Plaintiff was moderately limited in her ability to "carry out detailed

instructions."  (Tr. 106).  Dr. Gavazzi also found that Plaintiff was not

significantly limited in her ability to carry out very short and simple instructions;

maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 106).  Dr. Gavazzi explained that Plaintiff could "make simple decisions. . . .[,] be able to maintain regular attendance and be punctual. . . . [and] carry out very short and simple instructions."  (Tr. 106).

Dr. Gavazzi also opined that Plaintiff had social interaction limitations.  (Tr. 106).  Dr. Gavazzi found that Plaintiff was moderately limited in her ability to interact appropriately with the general public.  (Tr. 106).  Dr. Gavazzi also found that Plaintiff was not significantly limited in her ability to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibited behavioral extremes, and maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (Tr. 106-107).  In furtherance of these findings, Dr. Gavazzi noted that Plaintiff struggled "with

social skills." (Tr. 107). Dr. Gavazzi also found that Plaintiff could communicate "clearly, relate[d] appropriately to familiar others, and behave[d] predictably in most social situations." (Tr. 107). Additionally, Dr. Gavazzi stated that Plaintiff was "able to maintain socially appropriate behavior" and could "perform the personal care functions needed to maintain an acceptable level of personal hygiene." (Tr. 107).

In the area of his mental RFC assessment labeled "Additional Explanation," Dr. Gavazzi indicated that Plaintiff presented "with symptoms of depression," she took psychotropic agents, and she did not participate in mental health treatment. (Tr. 107). He also considered "[t]he possibility of some type of organic dysfunction . . . based on the [Plaintiff's] report of a severe head trauma due to an MVA in 2003." (Tr. 107). Dr. Gavazzi noted that "[a]n imaging report indicate[d] that there [was] some structural brain damage in the inferior portions of the frontal lobes." (Tr. 107). According to Dr. Gavazzi, "[t]hese changes [were] consistent with" a motor vehicle accident. He also noted that Plaintiff had worked since her accident, which included "caring for an invalid for the past three years." (Tr. 107). He found that she "performed a variety of simple work skills in that position." (Tr. 107). Dr. Gavazzi also stated that he did not order "cognitive testing" because of Plaintiff's "ability to perform simple work functions in that position." (Tr.

107).  He also concluded that Plaintiff's "functional capacities in that job are a

better indicator of her ability to work than the structural changes described with an

imaging study."  (Tr. 107).  Plaintiff's "ADLS [were] functional from a mental

body systems perspective."  (Tr. 107).  Dr. Gavazzi found Plaintiff's statements

"partially credible" based on the evidence of record.  (Tr. 107).  Dr. Gavazzi also

concluded that the "DD-164 submitted by Dr. Yelinek was not given full weight

due to inconsistencies with the totality of the evidence in the file."  (Tr. 107).

Specifically, Dr. Gavazzi noted that "[t]he ratings cited on the DD-164 [were] an

overestimate of the severity of the [Plaintiff's] functional limitations."  (Tr. 107).

"For example," Dr. Gavazzi stated:

> Dr. Yelinek indicate[d] marked limitations for CPP; however,
> she was able to complete serial sevens and perform simple
> skills on a consistent basis in her most recent job.
> Additionally, [Plaintiff] drove to the CE and arrived on time.
> These pieces of evidence [were] given greater weight then Dr.
> Yelinek's check marks from an isolated examination.

(Tr. 107).  Finally, Dr. Gavazzi found that "[b]ased on the totality of the evidence

in file, the claimant can perform simple, routine, repetitive work in a stable

environment."  (Tr. 107).

On July 5, 2011, Plaintiff presented to Waynesboro Family Medical

Associates for a follow up to her x-rays.  (Tr. 385).  Plaintiff noted that her

complaints regarding her right hip and index finger were unchanged.  (Tr. 385).

Plaintiff did state that she began to experience pain in left lateral thigh and left

buttock.  (Tr. 385).  Plaintiff was referred to an orthopaedic doctor for a further

evaluation.  (Tr. 385).

On July 7, 2011, Plaintiff was examined by Shabbar Hussain, M.D., at

Orthopaedic Associates, Chambersburg, Pennsylvania.  (Tr. 354).  Plaintiff

complained of bilateral hip pain, specifically "pain in the posterior aspect of the

hip" and "pain in the anterior groin region."  (Tr. 354).  Dr. Hussain noted that

Plaintiff exhibited pain on internal and external rotation of the hip, but "X-rays

revealed questionable degenerative joint disease of the hip joint."  (Tr. 354).  Dr.

Hussain ordered Plaintiff to undergo an MRI of her hip joints.  (Tr. 354).

On July 18, 2011, Plaintiff underwent an MRI of her hip joints at

Waynesboro Hospital.  (Tr. 355).  The MRI found Plaintiff to have a "moderate

left-sided hip joint effusion present which [was] asymmetric when compared to the

right side."  (Tr. 355).  As to her right hip, Plaintiff was found to have "minimal

hip joint fluid visible."  (Tr. 355).  The MRI found no evidence of "hip joint

dislocation or avascular necrosis on either side," or "acute muscle edema."  (Tr.

355).  Plaintiff's "visualized tendons appear[ed] intact."  (Tr. 355).  The MRI also

found that Plaintiff's uterus was partially visible and revealed "several probable

uterine fibroids," and "[s]everal nabothian cysts."  (Tr. 355).

On August 2, 2011, Plaintiff returned to Orthopaedic Associates to review the results of the MRI on her hip joints, which revealed "a moderate left-sided hip joint effusion" and "minimal right-sided effusion."  (Tr. 354).  The MRI also revealed that Plaintiff had a "partial visualization of uterine fibroid" and "an effusion of the hip which could [have been] a synovial process."  (Tr. 354).  Dr. Hussain instructed Plaintiff to receive an injection of corticosteroid in her hip, but Plaintiff indicated that she "wanted to just take nonsteroidal anti-inflammitory medication."  (Tr. 354).

On October 4, 2011, Dr. Hussain found Plaintiff to have "bilateral hip pain," and noted that it appeared that she had "synovitis with effusion."  (Tr. 353).  Dr. Hussain offered Plaintiff an "interarticular injection of the hip," but Plaintiff elected to forgo that procedure.  (Tr. 353).  Dr. Hussain instructed Plaintiff to "continue doing nonsteroidal anti-inflammatory medications," and return for a follow up in three (3) months.  (Tr. 353).

On October 14, 2011, Plaintiff underwent an evaluation at Waynesboro Physical Therapy and Sports Medicine ("Waynesboro PT").  (Tr. 407).  She presented with a chief complaint of pain in her right "SI region."  (Tr. 407). Specifically, Plaintiff complained of "[p]ain in posterior hip/SI region for about 2

years." (Tr. 407). The pain in her right posterior hip was recorded at a five (5) out of ten (10) at her evaluation. (Tr. 407). Plaintiff indicated that the pain reache[d] a ten (10) of ten (10) at its worst, from prolonged static positioning, stairs, and/or prolonged weight bearing. (Tr. 407). Plaintiff, after undergoing a functional assessment, was found to have a fifty-six percent (56%) disability in her "foot/ankle/knee." (Tr. 407). Additionally, Plaintiff was found to have moderate limitation as to walking, getting dressed, stairs, and squatting. (Tr. 407).

In regards to her hips, Plaintiff's active and passive range of motion were evaluated. Her right hip active range of motion was found to be: one hundred and twenty degrees (120°) flexion; and five degrees (5°) extension. (Tr. 408). Her right hip gross strength was found to be four minus (4-) of five (5) flexion; three plus (3+) of five (5) extension and abduction; and four (4) of five (5) adduction. (Tr. 408). Plaintiff's left hip active range of motion was found to be one hundred and thirty degrees (130°) flexion and ten degrees (10°) extension. (Tr. 408). As to her passive range of motion in her hips, the evaluation found the following: straight leg raise ("SLR") was sixty-five (65) in the right and ninety (90) in the left; internal rotation ("IR") forty (40) in the right and fifty-five (55) in the left; and external rotation ("ER") seventy (70) in the right and ninety (90) in the left. (Tr. 408). Plaintiff also under went a number of "special tests" on her right hip.

39

(Tr. 408).  Specifically, Plaintiff under went a FABER and Scour examination, both of which were positive.  (Tr. 408).

Plaintiff's L-Spine was also evaluated during her examination.  (Tr. 408). Her active range of motion as to her L-Spine was found to be twenty-five percent (25%) flexion; seventy-five percent (75%) extension; fifty percent (50%) sidebending right; and one hundred percent (100%) sidebending left.  (Tr. 408). Plaintiff was found to have poor core stability "as assessed by supine bridge."  (Tr. 408).  As to palpitation, Plaintiff exhibited "TTP right SI joint."  (Tr. 408).

After the evaluation, it was noted that "subjective, objective and functional deficits associated with hip DJD and SI dysfunction" were found.  (Tr. 408).  It was also reported that such deficits could be "addressed by physical therapy intervention."  (Tr. 408).  Plaintiff was then "educated about [her] problem and participated in the making of her LTG's."  (Tr. 408).  It was recommended that Plaintiff undergo physical therapy three (3) times a week for four (4) weeks, with treatments to consist of the following: range of motion exercises, strengthening, ultrasound, E-stim, manual stretching, gait training, HEP strength, flexibility, symptom management, conditioning, cryotherapy, and heat packs.  (Tr. 409).

On October 17, 2011, Plaintiff attended physical therapy at Waynesboro PT. (Tr. 410).  Plaintiff reported that "she had no pain for 3 hours after her last session,

but her pain gradually returned," and that she felt "some popping about her left

SI." (Tr. 410). Plaintiff was instructed to continue to progress "per plan of care."

(Tr. 410).

On October 19, 2011, Plaintiff attended physical therapy at Waynesboro PT.

(Tr. 411). She reported that she had "low back soreness." (Tr. 411). Plaintiff also

reported that "[s]he did not have an increase in sxs following her last Tx or

yesterday." (Tr. 411). Plaintiff indicated that she believed "her back [was] sore

from sitting a lot yesterday." (Tr. 411). It was found that Plaintiff "require[ed]

frequent cueing for form with therex," and had an "increase in hip and low back

sxs with SLR and HS stretch." (Tr. 411). Moving forward, Plaintiff was

instructed to "[c]ontinue to progress per plan of care." (Tr. 411).

On October 24, 2011, Plaintiff attended physical Waynesboro PT. (Tr.

423). Plaintiff reported that she felt "as though she [was] getting stronger,

however she had mild increase in low back soreness following last session." (Tr.

412). Plaintiff was found to be "continuing to progress with core stability BP cuff

exercises and [was] able to complete them with less fluctuation in cuff pressure."

(Tr. 412). Plaintiff was instructed to "[c]ontinue to progress per plan of care."

(Tr. 412).

On October 26, 2011, Plaintiff attended physical therapy at Waynesboro PT.

41

(Tr. 413).  Plaintiff reported that her right hip and SI joint were "more sore" due to the cold weather.  (Tr. 413).  Plaintiff indicated that she was not as active when sore, and thus, "not able to perform ADL's around her home."  (Tr. 413).  Plaintiff was found to have "tolerated increased resistence on standing hip strengthening exercises well."  (Tr. 413).  It was also noted that she was "exhibiting better control with core stabilization exs."  (Tr. 413).  She was instructed to continue her plan.  (Tr. 413).

On November 2, 2011, Plaintiff attended physical therapy at Waynesboro PT.  (Tr. 414).  Plaintiff reported that she was sore from surgery she had on the Friday preceding her appointment.  (Tr. 414).  Plaintiff was found to be able to "perform some gentle ther ex without increase in symptoms."  (Tr. 414).  Plaintiff indicated that she experienced "some relief in hip/ SI jt. pain after ice/stim."  (Tr. 414).  It was also noted that during her therapy "[w]e held on all ther ex and decreased resistence that would increase intra-abdominal pressure and stretching."  (Tr. 414).  Plaintiff was instructed to continue with her plan.  (Tr. 414).

On November 4, 2011, Plaintiff attended physical therapy at Waynesboro PT.  (Tr. 415).  Plaintiff indicated that she was feeling better since her surgery, and that her "hip and back [were] also feeling better, but still ha[d] increased pain with walking, prolonged sitting, and prolonged standing activities."  (Tr. 415).  Plaintiff

"was able to resume full ther ex/stretching program for increased LR and core strengthening without increase in symptoms." (Tr. 415). Plaintiff was instructed to continue with her treatment plan. (Tr. 415).

On November 9, 2011, Plaintiff attended physical therapy at Waynesboro PT. (Tr. 416). Plaintiff reported that "her hip and back [felt] much better today than it did last week." (Tr. 416). Plaintiff also indicated that she could "move her body with much less pain while performing ADL's, and note[d] that walking [was] much better too." (Tr. 416). Plaintiff was "still having difficulty holding pelvic tilt while performing core strengthening exs. because weakness, and needs V.C's for correct performance." (Tr. 416). Plaintiff also was found to have "tolerated [the] session with no increase in pain level." (Tr. 416). Plaintiff was instructed to continue her plan of care. (Tr. 416).

On November 14, 2011, Plaintiff attended physical therapy at Waynesboro PT. (Tr. 416). Plaintiff reported that the continued to "have right posterior hip/SI jt. soreness [i]f she [sat] or [stood] for prolonged time." (Tr. 416). Plaintiff also indicated that her "therapy [was] really helping and she [was] able to do more ADL's around her home, and [was] taking less pain meds over the past two weeks." (Tr. 416). It was noted that Plaintiff continued to "progress toward decreased pain with ADL's goals . . . . [and would] benefit continuing PT to help

increase right hip and core strength for better support." (Tr. 416).  Plaintiff was

instructed to continue her plan of care.  (Tr. 416).

On November 21, 2011, Derek Kling, PT, of Waynesboro PT, evaluated

Plaintiff and completed a progress note.  (Tr. 418-420).  Plaintiff reported that she

was "65% improved since initiating PT . . . . [and that] [h]er primary complaint

[was] pain with prolonged standing/walking or prolonged sitting (30 Mins)."  (Tr.

418).  Plaintiff indicated that, in regards to her right posterior hip, her pain was

currently at a four (4) of ten (10) and an eight (8) of ten (10) at its worst.  (Tr.

418).  Plaintiff underwent a functional assessment on her "foot/ankle/knee" and

was found to have a forty-two percent (42%) disability, which was down from her

fifty-six percent (56%) disability measured on October 14, 2011.  (Tr. 418).

Plaintiff was found to have moderate limitation as to walking, getting dressed,

stairs, and squatting.  (Tr. 418).

During her evaluation, Physical Therapist Kling also measured Plaintiff's

active and passive range of motion as to her hips, gross strength as to her right hip,

and active range of motion as to her L-Spine.  (Tr. 419).  Her active range of

motion for her right hip was measured at one hundred and twenty degrees (120°)

flexion and one hundred degrees (100°) extension.  (Tr. 419).  Plaintiff's active

range of motion for her left hip was measured at one hundred and thirty degrees

(130°) flexion and ten degrees (10°) extension.  (Tr. 419).  Compared to the

measurements taken on October 14, 2011, regarding the active range of motion of

Plaintiff's hips, Plaintiff's right hip extension was the only improvement, while

the remaining measurements were unchanged.  (Tr. 419).  As to her right hip gross

strength, it was found to be four (4) of five (5) flexion; four minus (4-) of five (5)

extension and abduction; and four plus (4+) of five (5) adduction.  (Tr. 430).  In

regards to her passive range of motion in her hips, the follow was measured: SLR

seventy-five (75) in the right and ninety (90) in the left; IR fifty (50) in the right

and fifty-five (55) in the left; and ER eighty-five (85) in the right and ninety (90)

in the left.  (Tr. 430).  Compared to her October 14, 2011 evaluation, Plaintiff's

right hip showed improvement, whereas her left hip remained unchanged.  (Tr.

419).  Plaintiff also performed FABER and Scour tests.  (Tr. 419).  The FABER

test was positive, while the Scour test was negative.  (Tr. 419).  In regards to her

L-Spine, her active range of motion improved from twenty-five percent (25%) to

seventy-five percent (75%) flexion, while her extension remained at seventy-five

percent (75%).  (Tr. 419).

On November 23, 2011, Plaintiff attended physical therapy at Waynesboro

PT.  (Tr. 421).  She reported that her "right SI and hip [were] feeling more sore

today than usual."  (Tr. 421).  These areas had not felt the same "since she walked

and stood for several hours the other day." (Tr. 421). Plaintiff remained "very

challenged with core strengthening exs. . . . [and had] hard time controlling core

while moving LE's." (Tr. 421). Further, it was reported that Plaintiff needed

"supervision to get correct form for performing exs. well." (Tr. 421). Plaintiff

was instructed to continue her plan of care. (Tr. 421).

On November 30, 2011, Plaintiff attended physical therapy at Waynesboro

PT. (Tr. 422). Plaintiff indicated that she was "feeling 75-80% better overall, and

ha[d] minimal c/o pain" that morning. (Tr. 422). Plaintiff also reported that she

continued to "perform more ADL's with less pain and feels that PT [was] really

helping her." (Tr. 422). Plaintiff "tolerated increased resistance on standing hip

exs. and clamshell ex. well." (Tr. 422). Plaintiff also indicated that she felt

"comfortably challenged with increase . . . . [and was] [p]rogressing toward

strength goals." (Tr. 422). She was instructed to continue her plan of care. (Tr.

422).

On December 5, 2011, Plaintiff attended physical therapy at Waynesboro

PT. (Tr. 423). Plaintiff reported that "she had to walk approx. 1 mile over the

weekend after her care broke down." (Tr. 423). According to Plaintiff, she "went

very slowly and was able to avoid any major flare up of pain." (Tr. 423). Plaintiff

continued "to progress well with ther. ex. . . . [and] [h]ip and core stability [were]

improving, but remain[ed] decreased." (Tr. 423). Plaintiff was instructed to continue her plan of care. (Tr. 423).

On December 7, 2011, Plaintiff attended physical therapy at Waynesboro PT. (Tr. 424). She reported "increased pain since last visit, and believes it [was] from increasing some ther ex and standing and walking a lot while shopping." (Tr. 424). During her session, Plaintiff reported increased pain and "needed to decrease weight on standing hip exs. and SLR's for comfort." (Tr. 424). Plaintiff indicated that "pain slightly decreased after ice/estim." (Tr. 424). Plaintiff was instructed to continue her plan of care. (Tr. 423).

On December 12, 2011, Plaintiff attended physical therapy at Waynesboro PT. (Tr. 425). Plaintiff reported "that the soreness she had last week . . . subsided and she [was] feeling pretty good again," and that she continued "to note improvement." (Tr. 425). It was noted that Plaintiff did not have "c/o increased R hip or LB discomfort during exercises." (Tr. 425). Plaintiff was instructed to continue her plan of care. (Tr. 425).

On December 14, 2011, Plaintiff attended physical therapy at Waynesboro PT. (Tr. 426). Plaintiff stated that she was not "having any significant pain in her hip or back" that morning. (Tr. 426). Plaintiff reported that "she was up on her feet a lot the past several days shopping, and [did not] note[] increase in pain

afterwards." (Tr. 426). It was noted that Plaintiff "tolerated session with no increase in pain level." (Tr. 426). She was instructed to "progress per plan of care." (Tr. 426).

On December 19, 2011, Physical Therapist Kling evaluated Plaintiff and completed a progress note. (Tr. 427-429). Plaintiff reported that she was "80% improved since initiating PT," and "her primary complaint . . . [was] pain with prolonged standing/walking or prolonged sitting (2 hours.)." (Tr. 427). Plaintiff indicated that her current pain level in her right posterior hip was a zero (0) out of ten (10), while her pain at its worst was four (4) out of ten (10), which resulted from "prolonged sitting/walking." (Tr. 427). As to her functional status, Plaintiff was found to have a thirty-five percent (35%) disability in her "foot/ankle/knee," an improvement from the forty-two percent (42%) measurement taken on November 21, 2011. (Tr. 427). She was also found to have mild limitation as to walking, getting dressed, stairs, and squatting. (Tr. 427).

During her session, Plaintiff's hips were measured for their active and passive range of motion. (Tr. 428). Her hips were found to have an active range of motion of one hundred and thirty degrees (130°) flexion and ten degrees (10°) extension. (Tr. 428). Her right hip's passive range of motion was found to be SLR eighty (80), IR fifty (50), and ER eighty-five (85). (Tr. 428). Her left hips

passive range of motion was found to be SLR ninety (90), IR fifty-five (55), and ER ninety (90).  (Tr. 428).  Her right hip's gross strength was found to be four plus (4+) of five (5) flexion, four (4) of five (5) extension and abduction, and four plus (4+) of five (5) adduction.  (Tr. 428).  Plaintiff also underwent a FABER test and a Scour test, both of which were negative.  (Tr. 428).  Plaintiff also had her active range of motion as to her L-Spine evaluated during her December 19, 2011 session.  (Tr. 428).  Her L-Spine's active range of motion was seventy-five percent (75%) flexion and extension.  (Tr. 428).

Physical Therapist Kling recommended that Plaintiff "reduce frequency" of physical therapy "to once per week and wean to HEP 1 time(s) a week for 4 week(s)."  (Tr. 429).  Physical Therapist Kling also recommended that Plaintiff receive "treatments to consist of: ROM Exercises, Strengthening, Ultrasound, E-Stim, Manual Stretching, Gait Training, HEP: strength, Flexibility, symptom management, Conditioning, Flexibility, Cryotherapy/Heat Packs."  (Tr. 429).  On December 20, 2011, Plaintiff's treatment plan was approved by a physician.  (Tr. 429).

On December 21, 2011, Plaintiff attended physical therapy at Waynesboro PT.  (Tr. 430).  Plaintiff reported that she continued to have "discomfort with prolonged weight bearing," but also stated that she felt "good for the past few

days."  (Tr. 430).  It was noted that Plaintiff continued to "progress well with

resistive ther ex and core/pelvic stabilization," and that there was "[n]o significant

pelvic deviation found . . . therefore muscle energy was differed."  (Tr. 430).

Plaintiff was instructed to progress with her plan of care.  (Tr. 430).

On December 29, 2011, Plaintiff attended physical therapy at Waynesboro

PT.  (Tr. 431).  She reported that she fell the day before and bruised her knees,

[and] had "mild increased SI/hip pain."  (Tr. 431).  However, Plaintiff also

indicated that "little residual pain upon presentation today."  (Tr. 431).  It was

noted that Plaintiff "[t]olerated with decreased symptoms and increased function."

(Tr. 431).  Plaintiff was instructed to progress per her plan of care.   (Tr. 431).

On January 4, 2012, Plaintiff attended physical therapy at Waynesboro PT.

(Tr. 570).  Plaintiff reported that she continued to "feel better, and [was] weaning

off pain meds."  (Tr. 570).  Further, Plaintiff indicated that she could "perform

most light household ADL's without limitation, but still [had] minor increase in

pain when performing heavier lifting and strenuous activities."  (Tr. 570).

According to Plaintiff, she was "feeling around 90% better since beginning PT."

(Tr. 570).  It was noted that Plaintiff still needed "supervision with exercises set

up and correct performance of core strengthening exs."  (Tr. 570).  Plaintiff was

found to be "progression well towards all LTG's and will soon be ready for D/C to

independent exercise program." (Tr. 570).  Physical Therapist Kling noted

"[p]ossible D/C to HEP/Wellness program if continues to do well after next visit."

(Tr. 570).

On January 11, 2012, Plaintiff attended physical therapy at Waynesboro PT.

(Tr. 566-569).  Plaintiff reported that she was "99% improved since initiating PT,

[and] [h]er primary complaint [was] pain with stairs."  (Tr. 566); see (Tr. 569).  As

to pain in her right posterior hip, Plaintiff indicated that it was currently zero (0)

out of ten (10), while at its worst it was two (2) of ten (10).  (Tr. 566).  Her hips

had an active range of motion of one hundred and thirty degrees (130°) flexion

and ten degrees (10°) extension.  (Tr. 566).  As to her passive range of motion in

her hips, Plaintiff had SLR eighty-five (85) in the right and ninety (90) in the left,

IR was fifty (50) in the right and fifty-five (55) in the left, and ER was eighty-five

(85) in the right and ninety (90) in the left.  (Tr. 567).  The gross strength in

Plaintiff's right hip also was measured and found to be four plus (4+) of five (5)

flexion, extension, and adduction, and four (4) of five (5) abduction.  (Tr. 566-

567).  FABER and Scour tests were negative.  (Tr. 567).  As to her L-Spine,

Plaintiff had an active range of motion of one hundred percent (100%) flexion,

and sidebending right and left, and seventy-five percent (75%) extension.  (Tr.

567).  Plaintiff also had a normal gait, "fair +" balance, and "fair +" core stability.

(Tr. 566-567).  As to palpitation, she had "[m]inimal TTP right SI Joint

continue[d]."  (Tr. 567).  Additionally, Plaintiff had "met all but one LTG and

[was] ready for DC with a HEP."  (Tr. 567).  It was recommended that Plaintiff be

discharged with a home exercise program.  (Tr. 567).

On November 5, 2012, Dianne E. Elsom, LCSW, a licensed outpatient

therapist, drafted a "letter as treatment summary requested from PA Bureau of

Disability for client Karla Y. Fox."  (Tr. 597).  Therapist Elsom stated that

Plaintiff had "been attending outpatient psychotherapy with myself as primary

licensed therapist beginning October 04, 2011."  (Tr. 597).  Plaintiff attended

seventeen (17) sessions with Therapist Elsom, with the last session occurring on

May 15, 2012.  (Tr. 597).  Therapist Elsom diagnosed Plaintiff with "Depressive

D/O" at Axis I.  (Tr. 597).  Plaintiff's symptoms for Axis I included, but were not

limited to, the following: "agitated depression including severe anxiety in social

situations and work where expectations [were] present; anger outbursts, teariness,

lack of motivation and general sense of personal unworthiness [were] also

present."  (Tr. 597).  Therapist Elsom also noted that Plaintiff "also experienced

major head trauma in a severe car accident and experience[d] ongoing severe

memory loss and specific cognitive limitations."  (Tr. 597).  Therapist Elsom also

found that "[s]ocial and affective cues through communication [were] very hard

for the client to recognize and process." (Tr. 597). Additionally, Therapist Elsom noted that "[r]elationships [were] thus often conflicted and challenging for" Plaintiff. (Tr. 597). Finally, Therapist Elsom stated that Plaintiff "also suffer[ed] from obsessive compulsive tendencies including collecting and inability to manage life details due to fears and anxiety." (Tr. 597).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Poulos, 474 F.3d at 91; Schaudeck, 181 F.3d at 431; Krysztoforski, 55 F.3d at 858; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. § 405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter

v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529, 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340

U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir.

1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive DIB, the plaintiff must demonstrate he/she is:

> unable to engage in any substantial gainful activity by reason
> of any medically determinable physical or mental impairment
> which can be expected to result in death or which has lasted or
> can be expected to last for a continuous period of not less than
> twelve months.

42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905 (defining disability).  Further:

> an individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether

55

> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work. For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits.  See 20 C.F.R. § 416.920.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe[10] or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the RFC to return to his or her past work and (5) if not, whether he or she can adjust to other work in the national economy.  Id. "The claimant bears the ultimate burden of establishing steps one through four."  Poulos, 474 F.3d at 92 (citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004)).

As part of step four, when a claimant's impairment does not meet or equal a

---

10.  An impairment is severe if it significantly limits an individual's physical or mental ability to do basic work activities.  20 C.F.R. § 416.920.  Basic work activities are the abilities and aptitudes necessary to do most jobs, such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers and usual work situations;" and "[d]ealing with changes in a routine work setting."  Id. at 416.921.

listed impairment, the Commissioner will assess the RFC.  See 20 C.F.R. §

416.920.  RFC is the individual's maximum remaining ability to do sustained

work activities in an ordinary work setting on a regular and continuing basis.  See

Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and

continuing basis contemplates full-time employment and is defined as eight hours

a day, five days per week or other similar schedule.  The RFC assessment must

include a discussion of the individual's abilities.  Social Security Ruling 96-8p, 61

Fed. Reg. 34475; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359

n.1 ("'[RFC]' is defined as that which an individual is still able to do despite the

limitations caused by his or her impairment(s).").  Using the RFC assessment, the

Commissioner will determine whether the claimant can still perform past relevant

work, or can make an adjustment to other work.  Id.  If so, the claimant is not

disabled; and if not, he is disabled.  Id.

    "At step five, the burden of proof shifts to the Social Security

Administration to show that the claimant is capable of performing other jobs

existing in significant numbers in the national economy, considering the

claimant's age, education, work experience, and [RFC]."  Poulos, 474 F.3d at 92.

## ALJ DECISION

    At step one, the ALJ found that Plaintiff has not engaged in substantial

gainful activity since July 19, 2010, the alleged onset date.  (Tr. 21).

At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative joint disease, synovitis, residuals status post motor vehicle accident with fractures, and mild cognitive impairment.  (Tr. 21).

At step three, the ALJ found that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 22).

At step four, the ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b).  (Tr. 23).  The ALJ also found that Plaintiff had the following limitations: she must be able to alternate between sitting and standing at will; unable to do overhead lifting due to dizziness; limited to occasional fingering and gripping with her right dominant hand and occasional squatting, kneeling, and stooping due to her arthritis; limited to occasional climbing of ladders, ropes and stairs; she is unable to taste or smell and must avoid hazards in her right peripheral field of vision without turning her head; limited to understanding, remembering and carrying out simple instructions, such as those requiring a GED of 1 or 2 and reasoning math language of 1-6; limited to occasional decision making and work changes with respect to simple work; and can only have occasional interaction with supervisors and no interaction with

coworkers and the public.  (Tr. 23).

At step five, the ALJ found that Plaintiff was unable to perform any past relevant work.  (Tr. 28).  However, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there were jobs that exist in significant numbers in the national economy that the Plaintiff can perform.  (Tr. 28).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act, from July 19, 2010, through the date of the ALJ's decision.  (Tr. 29).

## DISCUSSION

On appeal, Plaintiff asserts the following: (1) "[t]he ALJ erred by relying on one job to find [Plaintiff] not 'disabled;'" (2) "[t]he ALJ did not determine properly [Plaintiff's] mental [RFC];" (3) "[t]he ALJ did not evaluate properly medical opinions in the record;" (4) "[t]he ALJ did not conclude properly that [Plaintiff's] Depressive Disorder was not 'severe.'"  (Doc. 11, p. 9).

Defendant disputes these claims, asserting the following: (1) "[t]he ALJ did not err at step two of the sequential evaluation process;" (2) substantial evidence supports the ALJ's RFC finding; (3) "the ALJ properly evaluated the respective evidence from Mr. Williams and Ms. Elsom;" (4) the ALJ did not err at step five because she satisfied her burden to produce evidence of other work that Plaintiff

could have performed before February 14, 2013.  (Doc. 12, pp. 7-25).

In her reply brief, Plaintiff reasserted that: (1) the ALJ committed reversible error at step five; (2) the ALJ committed reversible error by failing to properly determine Plaintiff's mental RFC; (3) the ALJ did not properly determine that Plaintiff's depressive disorder was not severe; and (4) the ALJ failed to properly evaluate the assessments by Psychologist Williams and Therapist Elsom.  (Doc. 13, pp. 1-7).

### 1. __Step Two Analysis__

The ALJ concluded that "[t]he record further shows a diagnosis of depressive disorder NOS at the consultative examination in May 2011 (citation omitted); however, the undersigned finds that this is not a severe impairment." (Tr. 22).  According to the ALJ, "[t]his diagnosis appears to be based on the [Plaintiff's] subjective complaints at that evaluation rather than longitudinal evidence showing that these symptoms were present for an ongoing period."  (Tr. 22) (citation omitted).  The ALJ also found that the "[r]ecords from the claimant's primary care physician show[ed] scant evidence of psychiatric abnormalities, and the claimant generally denied having any psychiatric symptomatology."  (Tr. 22). Further, the ALJ stated that there was "very little mental health treatment in the record, and the claimant did not list this impairment on her disability application."

(Tr. 22) (citation omitted).  The ALJ noted that Plaintiff's therapist suggested that she had "depressive disorder NOS in a latter dated November 5, 2012, but failed to provide any medical documentation to support this finding."  (Tr. 22) (citation omitted).  Additionally, the ALJ concluded that "[t]his [was] not a medical diagnosis since it was not made by an acceptable medical source."  (Tr. 22).

Plaintiff argues that the ALJ failed to properly conclude that her depressive disorder was severe.  (Doc. 11, p. 19).  In support, Plaintiff points to the findings of Dr. Gavazzi and Dr. Yelinek, both of which found that her depressive disorder was severe.  (Id.).  Further, Plaintiff states that "Therapist Elsom reported [Plaintiff] had a Depressive Disorder that caused significant limitations [(citation omitted)], making it 'severe.'"  (Id.).  Additionally, Plaintiff asserts that "[n]o medical source found [Plaintiff's] Depressive Disorder caused only minimal limitations."  (Id.).

As to the ALJ's finding that Plaintiff's depressive disorder was not severe, Plaintiff states that this conclusion "was unsupported by any medical source opinion and, in fact, was contradicted by the opinions from the above mental health specialists who addressed the issue."  (Id. at p. 20).  Further, Plaintiff contends that the ALJ "lacked the medical expertise to substitute her lay judgment for that by the trained medical professionals."  (Id.) (citing Morales, 225 F.3d at

317; <u>Woody</u>, 859 F.2d at 1161).  Thus, Plaintiff concludes, "[b]y not accepting that [Plaintiff's] Depressive Disorder was as limiting as the medical sources reported, the ALJ could not have appreciated the extent of the limitations it caused."  (Doc. 11, p. 20).  As a result of the foregoing, Plaintiff argues that the ALJ's "failure to assess properly the impairment was not harmless, and warrants reversal of the Commissioner's final decision."  (<u>Id.</u>).

Plaintiff also contends that the "ALJ did not perform the required regulatory analysis to support a finding about whether [Plaintiff's] Depressive Disorder was 'severe.'"  (<u>Id.</u>).  According to Plaintiff, "the regulations require that, to assess that issue, an ALJ must evaluate and document findings in each of the four 'B' criteria."  (<u>Id.</u>) (citing 20 C.F.R. § 404.1520(a)).  Plaintiff claims that the ALJ "followed the procedure to evaluate [Plaintiff's] TBI impairment [(citation omitted)], but failed to do so for [Plaintiff's] Depressive Disorder."  (<u>Id.</u>).  Plaintiff contends that the "ALJ's failure to do so is reversible legal error."  (<u>Id.</u>) (citing <u>Bunch v. Astrue</u>, 2011 U.S. Dist. LEXIS 139764, at *23-26 (M.D. Pa. 2011); <u>Keyser v. Astrue</u>, 648 F.3d 721, 725-27 (9th Cir. 2011); <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1214 (11th Cir. 2005)).

Defendant argues that "the record fails to demonstrate that Plaintiff's depression caused more than a minimal impact on her ability to perform basic

mental work activities.[footnote omitted]" (Doc. 12, p. 8). Specifically, Defendant states that the ALJ "explained that the objective medical evidence does not substantiate a finding that Plaintiff had severe depression" (Id. at p. 9). Defendant then asserts that the ALJ "recognized that the diagnosis of depression made by Dr. Yelinek, but found it was based on Plaintiff's subjective reports as opposed to evidence showing longitudinal depressive symptoms." (Id.). Further, the Defendant notes that the ALJ "stressed that reports from Plaintiff's family practitioners reflected scant evidence of psychiatric abnormalities and Plaintiff typically denied psychiatric symptoms." (Id.). Defendant also states that the ALJ decided to not credit "the diagnosis of depression by Plaintiff's therapist because Ms. Elsom is not an 'acceptable medical source,' and she did not even provide medical documentation to support such a finding." (Id.). "Moreover," Defendant argues, "under the regulations, an ALJ may (but is not required) to use evidence from other sources to show the severity of an individual's impairment and how it affects her ability to work." (Id.). As a result of the foregoing, Defendant concludes that "it was reasonable for the ALJ to conclude that Plaintiff did not have 'severe' depression." (Id.).

Defendant also takes issue with "Plaintiff's claim that the ALJ failed to rate the degree of her functional limitation in terms of her activities of daily living;

social functioning; concentration, persistence, or pace; and episodes of

decompensation (the 'B' criteria)." (Doc. 12, pp. 9-10) (citing 20 C.F.R. §

404.1520a(c)(3)). Defendant argues that, contrary to Plaintiff's contention, "[a]

review of the ALJ's decision shows that she considered the same." (Id. at p. 10).

Defendant points out that the ALJ concluded that Plaintiff had "no restriction in

her daily activities, citing her acts of caring for her dog, preparing meals,

performing household chores, shopping, driving, exercising, and searching for

employment." (Id.). Defendant states that the ALJ "found Plaintiff had no

difficulties regarding concentration, persistence, or pace, given clinical reports that

she exhibited good attention and concentration; a good fund of information,

concept formation, and test judgment; and average intelligence." (Id.).

Additionally, the Defendant notes that the ALJ "recognized Plaintiff's reported

limited social judgment and inability to notice social cues, as well as poor anger

tolerance, but found no evidence of significant anxiety or antisocial behaviors."

(Id.). Defendant states that "[a]ccordingly, the ALJ assessed moderate difficulties

in social functioning." (Id.). Defendant then asserts that the "ALJ explained that

the evidence showed Plaintiff had experienced no episodes of decompensation of

extended duration." (Id.). According to Defendant, "[t]hese findings further

bolster the ALJ's finding that Plaintiff's depression did not have a significant

impact in her functioning."  (Doc. 12, p. 10).

Finally, Defendant contends that "[e]ven if the Court accepts Plaintiff's argument that the ALJ erred regarding her depression, remand is unwarranted." (Id. at p. 11).  Defendant argues that the "Third Circuit has explained that where the Commissioner finds that the claimant suffers from even one severe impairment, any failure on the Commissioner's part to identify other conditions, as being severe does not compromise the integrity of the analysis."  (Id.) (citing Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 145 n.2 (3d Cir. 2007)).  Thus, Defendant contends, "[b]ecause the ALJ found in Plaintiff's favor at step two, even if she improperly concluded that some of Plaintiff's other impairments were non-severe, any error was harmless."  (Id.).

In Desando v. Astrue, the ALJ failed to "consider whether fibromyalgia was a medically determinable impairment that imposed significant restrictions on [the plaintiff's] ability to perform basic work activities."  2009 U.S. Dist. LEXIS 27817, at *15 (M.D. Pa. 2009) (Vanaskie, J.).[11]  Nevertheless, the district court determined this was harmless error because the ALJ found that Plaintiff had severe impairments sufficient to move beyond the second step of the five-step sequential

_____

11.  Judge Vanaskie has since been elevated to the United States Court of Appeals for the Third Circuit.

evaluation process.  Desando, 2009 U.S. Dist. LEXIS 27817, at *15 (citing Salles,

229 F. App'x at 145 n.2; Bradley v. Barnhart, 178 F. App'x 87, 90 (7th Cir. 2006);

Bliss v. Astrue, 2009 U.S. Dist. LEXIS 12172, at *3 (W.D. Pa. 2009)); see also

Ralph v. Colvin, 2015 U.S. Dist. LEXIS 61083, at *52 (M.D. Pa. 2015) (Conner,

J.) ("A failure to find a medical condition severe at step two will not render a

decision defective if some other medical condition was found severe at step two.")

(citing Snedeker v. Comm'r of Soc. Sec., 244 F. App'x 470, 474 (3d Cir. 2007);

Desando, 2009 U.S. Dist. LEXIS 27817, at *15).

     Here, similarly, the ALJ found that Plaintiff had severe impairments at step

two.  (Tr. 21).  Specifically, the ALJ determined that Plaintiff had the following

severe impairments: degenerative joint disease, synovitis, residuals status post

motor vehicle accident with fractures, and mild cognitive impairment.  (Tr. 21).

As noted above, however, the ALJ determined that Plaintiff's "diagnosis of

depressive disorder NOS at the consultive examination in May 2011" was not a

severe impairment, because this diagnosis appeared to be "based on the

[Plaintiff's] subjective complaints at that evaluation rather than longitudinal

evidence showing that these symptoms were present for an ongoing period."  (Tr.

22).  The ALJ also noted that "[r]ecords from the claimant's primary care

physician show scant evidence of psychiatric abnormalities, and [Plaintiff]

generally denied having any psychiatric symptomatology." (Tr. 22). Further, the ALJ stated that "[t]here is very little mental health treatment in the record, and the claimant did not list this impairment on her disability application." (Tr. 22). Additionally, the ALJ found that Plaintiff's "therapist suggested that [Plaintiff] ha[d] depressive disorder NOS in a letter dated November 5, 2012, but failed to provide any medical documentation to support this finding." (Tr. 22). The ALJ also noted that the diagnosis made by Plaintiff's therapist was "not a medical diagnosis since it was not made by an acceptable medical source." (Tr. 22).

Notably, while the ALJ did not find that Plaintiff's depression was a severe impairment, she did take Plaintiff's "mental impairment" into consideration at step three, (Tr. 22-23), and her "psychiatric symptomatology," inter alia, into consideration when setting Plaintiff's RFC. (Tr. 26); see (Tr. 27-28). Additionally, the ALJ considered the opinions of Dr. Yelinek, Dr. Gavazzi and Therapist Elsom, all of which addressed Plaintiff's depression. (Tr. 26-28).

Therefore, based on the foregoing, the ALJ did not commit reversible error at step two by failing to classify Plaintiff's depression diagnosis as a severe impairment because she found that Plaintiff had a number of severe impairments and took Plaintiff's "mental impairment" into consideration at step three and her "psychiatric symptomatology" into consideration when setting Plaintiff's RFC.

<u>See</u> (Tr. 21-22, 26-28).

## 2.  **Medical Opinion Evidence**

The preference for the treating physician's opinion has been recognized by the United States Court of Appeals for the Third Circuit and by all of the federal circuits.  <u>See</u>, <u>e.g.</u>, <u>Morales v. Apfel</u>, 225 F.3d 310, 316-18 (3d Cir. 2000).  This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time."  <u>Id.</u> at 317; <u>Plummer v. Apfel</u>, 186 F.3d 422, 429 (3d Cir. 1999); <u>see also</u> 20 C.F.R. § 416.927(d)(2)(i) (1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").  However, the ALJ is permitted to give great weight to a non-examining, non-treating physician's opinion if the assessment is well-supported by the evidence of record.  <u>See</u> <u>Sassone v. Comm'r of Soc. Sec.</u>, 165 F. App'x 954, 961 (3d Cir. 2006); <u>Day v. Colvin</u>, 2016 U.S. Dist. LEXIS 3229, at *27 (M.D. Pa. Jan. 11, 2016) (Nealon, J.) (citations omitted); <u>Santos v. Colvin</u>, 2014 U.S. Dist. LEXIS 152631, at *44 (M.D. Pa. 2014) (Nealon, J.) (citing <u>Sassone</u>, 165 F. App'x at 961; <u>Baker v. Astrue</u>, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. 2008)); <u>Baker</u>, 2008 U.S. Dist. LEXIS 62258.

When the treating physician's opinion conflicts with a non-treating, non-

examining physician's opinion, the ALJ may choose whom to credit in his or her

analysis, but "cannot reject evidence for no reason or for the wrong reason."

Morales, 225 F.3d at 316-18.  It is within the ALJ's authority to determine which

medical opinions he rejects and accepts, and the weight to be given to each

opinion.  20 C.F.R. § 416.927.  Regardless, the ALJ has the duty to adequately

explain the evidence that she rejects or to which she affords lesser weight.  Diaz v.

Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because

the ALJ did not provide an adequate explanation for the weight he gave to several

medical opinions, remand was warranted).  "The ALJ's explanation must be

sufficient enough to permit the court to conduct a meaningful review."  In re

Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS 100625, at *5-8 (D.N.J.

July 19, 2012) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d

Cir. 2000)).

Upon review of the entire record and the ALJ's RFC determination, it is

determined that the ALJ improperly afforded great weight to Dr. Gavazzi, a state

agency psychological consultant, in reaching her RFC determination because the

state agency examination record indicates that the whole medical record was not

available for review by Dr. Gavazzi.  (Tr. 100-102).  In particular, Dr. Gavazzi's

opinion was based on a review of the record that did not include Plaintiff's files

69

from her sessions with Therapist Elsom.  (Tr. 100-102).  Importantly, "in order for the ALJ to properly give any weight to a medical opinion, the entire medical record must have been available for and reviewed by the non-examining, non-treating physician."  Day, 2016 U.S. Dist. LEXIS 3229, at *30-31 (citing Sassone, 165, F. App'x at 961); Santos, 2014 U.S. Dist. LEXIS 152631, at *46 (citing Sassone, 165 F. App'x at 961).  However, as noted, the entire medical record was not available to Dr. Gavazzi, whose opinion was afforded great weight by the ALJ. (Tr. 27, 100-102).

Therefore, because the opinion of the state agency psychological consultant, Dr. Gavazzi, was not well-supported by the entire record as it did not include a review of the entire record, including the sessions Plaintiff had with Therapist Elsom that occurred after the opinion was issued on June 30, 2011, substantial evidence does not support the ALJ's RFC determination.  As such, remand on this basis is necessary, and this Court declines to address Plaintiff's remaining assertions.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision

of the Commissioner will be vacated, and the matter will be remanded to the

Commissioner of SSA for further proceedings.

A separate Order will be issued.

**Date**: March 18, 2016                    /s/ William J. Nealon
                                            **United States District Judge**